**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN
DISTRICT OF WEST VIRGINIA
WHEELING DIVISION**

| | | |
|---|---|---|
| **J & M DISTRIBUTING, INC.**, a West Virginia corporation, | ) ) ) | |
| Plaintiff, | ) | Case No.: 5:12-cv-69 |
| v. | ) ) | |
| **HEARTH & HOME TECHNOLOGIES, INC.**, an Iowa corporation, and **MAGNOTTI and SONS, INC. d/b/a THE FIREPLACE and THE PATIOPLACE**, | ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) | |

## COMPLAINT

COMES NOW, the Plaintiff, J&M Distributing, Inc., and for its Complaint against Defendants Hearth & Home Technologies, Inc. and Magnotti and Sons, Inc., d/b/a The Fireplace and The Patioplace, states as follows:

## PARTIES

1.      Plaintiff J&M Distributing, Inc. ("J&M") is a purchaser of and wholesale redistributor for certain of Hearth & Home Technologies, Inc.'s products having created a dealer network for that purpose.

2.      J&M is a corporation organized under the laws of the State of West Virginia, with its principal place of business in Wheeling, West Virginia.

3.      Defendant Hearth & Home Technologies, Inc. (and its acquired predecessor organizations) ("HHT") is a leading manufacturer of gas, electric and wood-burning fireplaces, inserts, stoves and related products.  Defendant HHT is a corporation organized under the laws of the State of Iowa, with its principal place of business in Lakeville, Minnesota.

4.     Defendant Magnotti and Sons, Inc. d/b/a The Fireplace AND The Patioplace ("the Fireplace") is a retailer and distributor of fireplaces and related products, including HHT's products.  The Fireplace is organized under the laws of the Commonwealth of Pennsylvania, doing business in Pennsylvania and West Virginia.

## JURISDICTION AND VENUE

5.     The amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.  This Court, therefore, has diversity jurisdiction over the case pursuant to 28 U.S.C. § 1332.  Federal question jurisdiction also exists pursuant to 28 U.S.C. §§ 1331 and 1337 because this civil action is also brought to resolve claims alleged under federal antitrust law, specifically allegations under the Sherman Act, 15 U.S.C. § 1 and Robinson-Patman Act, 15 U.S.C. § 13(a), (d), (e) and (f).  This Court also has supplemental jurisdiction over state law issues that exist pursuant to 28 U.S.C. § 1367(a).

6.     A substantial part of the events giving rise to J&M's claims occurred within the Northern District of West Virginia, providing proper venue pursuant to 28 U.S.C. § 1391.

7.     HHT is a national company which is subject to this Court's general and specific jurisdiction.  HHT is subject to general jurisdiction in this District by virtue of its numerous contacts and sales of its products with this jurisdiction, and HHT is subject to specific jurisdiction in this case as created by its numerous contacts within West Virginia which have given rise to this lawsuit.

8.     Magnotti and Sons, Inc. d/b/a The Fireplace AND The Patioplace ("the Fireplace") is subject to jurisdiction in West Virginia by virtue of its numerous contacts in West Virginia including sales, bidding and a customer base in West Virginia.  The Fireplace actively solicits and makes sales and bids for business in West Virginia.

2

## FACTS

9.      Plaintiff incorporates by reference paragraphs 1 through 8 above, as if fully set forth herein.

10.     In 1986, the Shimek Brothers, Ron and Dan, introduced a patented new product for their company, Heat-N-Glo.  The product was a direct-vent fireplace using an airtight combustion chamber that takes air from outside.

11.     J&M Distributing was started in 1981 by Jim Kleeh and began a relationship with Heat-N-Glo in 1987.  At that time, J&M entered into a business relationship with Heat-N-Glo (an acquired predecessor organization to HHT) for the purpose of distributing Heat-N-Glo products through a distributor supporting retail dealers.  J&M agreed to create a distribution business through his own dealer network in this region for that purpose.

12.     Pursuant to this verbal agreement, J&M entered into a business relationship with HHT's predecessor under which Heat-N-Glo products were sold to J&M and J&M was authorized to redistribute those products to dealers recruited by J&M in an area which over time included West Virginia, Western Pennsylvania, Ohio and Western Maryland.

13.     J&M has recruited and built a network of approximately sixty (60) dealers and was granted an exclusive territory for Heat-N-Glo products, covering parts of West Virginia, Western Pennsylvania, Western Maryland and Eastern Ohio.  J&M established its warehouse in Wheeling, West Virginia area to service dealers.

14.     From the outset, and through its course of dealing with HHT, it was understood that: (1) the established territory was exclusive to J&M; (2) J&M would dedicate itself to HHT exclusively and not carry competing brands; and (3) the relationship would only be terminated for good cause or by the purchase by HHT for fair compensation unless a manufactured

3

approved entity was allowed to purchase.  Further, HHT had good faith and fair dealing obligations to fully support and foster J&M's sales of HHT products.

15.    By 1996, Heat-N-Glo revenues nationally had jumped to more than $100 million. In 1996, the Shimeks sold the Heat-N-Glo business to HON, an Iowa furniture maker.

16.    HON merged the company with Heatilator, its commercial fireplace division, to form Hearth Technologies, Inc., the world's largest fireplace manufacturer.

17.    J&M's record of service, sales and payment has always been exemplary through its twenty-five years with HHT.  There has never been a basis for termination for good cause.

18.    J&M worked hard for HHT, purchased products regularly, and paid on time. J&M took care of its dealers and created a successful and profitable business with significant goodwill.

19.    Throughout this period of growth and acquisitions, the relationship and agreement with J&M never changed.

20.    Prior to 2001, the Fireplace was principally a retailer carrying competing brands with little warehouse function dedicated to serving dealers with little sales of HHT products.

21.    In 2001, HHT and the Fireplace discussed with J&M the purchase by the Fireplace of the J&M business in its entirety or a portion of the business in the nature of a carve-out of territory in Western Pennsylvania from J&M's exclusive territory.

22.    An agreed upon compensation (consisting of cash and credits) was paid to J&M to relinquish part of its exclusive distribution territory for dealers in Western Pennsylvania (five counties) to the Fireplace for Heat-N-Glo products only.  The Fireplace was not happy it did not receive more of the J&M territory, but the decision to sell part of its exclusive territory belonged to J&M and this was acknowledged by HHT.

4

23.     The Fireplace's desire for the Western Pennsylvania territory was directed primarily at eliminating competition from J&M's dealers of Heat-N-Glo products rather than on taking on a warehouse/distributor function to service those dealers.  In fact, the service and support to those dealers has been poor.

24.     J&M's relationship with HHT was so successful that in approximately 2003 it was asked to serve as a sales representative in its region to develop business for another brand line of HHT products, Quadra-Fire.  J&M was so successful at developing the Quadra-Fire business that in 2007 it was awarded distribution rights for this product for its entire original exclusive territory, including Western Pennsylvania.

25.     In 2004, J&M was also asked to distribute the Heatilator brand, another product line of HHT, to its dealers in the entirety of its exclusive territory, including the five counties of Western Pennsylvania sold to the Fireplace for Heat-N-Glo distribution.

26.     J&M's relationship was so successful and of such benefit to HHT that in 2006 it was invited to Minnesota and attended a series of small meetings to discuss with senior management and the HHT law department their policies on dealers and distributor relations. This included discussion of HHT's policy that confirmed that there would have to be non-curable justification for termination of a distributorship and any buy-out of the distributor would be based upon reasonable compensation.

27.     In 2008, after complaints from the Fireplace, HHT purposed that J&M give up a portion of its exclusive Quadra-Fire territory in Western Pennsylvania to the Fireplace in exchange for J&M receiving distribution rights for HHT's Harmon products in West Virginia. This proposal was made by HHT in order to direct more sales and territory to The Fireplace. J&M declined this proposal.

28.     In 2009, HHT's Senior VP, Alan Trusler, traveled to J&M to thank J&M for its great success in selling HHT products and noted that, in the then tough economic times, that J&M was one of only eight companies across the country that showed an increase in sales for HHT.  Mr. Trusler reviewed J&M's financials and commented on how solid and attractive they were when viewed from the prospective of the value of the J&M business as an acquisition candidate.  He indicated that HHT would be interested in such an acquisition for fair compensation, but was not in an acquisition mode at that time.

29.     Earlier, at various points of time, HHT had been in an acquisition mode and had purchased other distributorships in the system for fair compensation, including: Edward George Company, Allied Group, American Fireplace (Thulman Eastern), Fireplace Distributors, FCM/Comfort Wholesale, Madison Fireplace Inc., The Minocqua Fireplace Company, J&D, and more.

30.     J&M purchases from HHT have been in recent years in excess of $1.2 million with its dealer network making estimated retail sales approaching $3 million.  J&M pricing from HHT is based on a wholesale function and its dealers buy product from J&M after a standard mark-up.

31.     Beginning in late 2009 or early 2010 the Fireplace's business had suffered due to the downturn in the economy and its impact of home building.  In response, the Fireplace and HHT began an agreed upon and concerted campaign ("campaign") to sabotage sales by J&M and its dealers in order to expand the Fireplace's sales generally and its territorial footprint in competition with J&M and its dealers.  The object of this agreed upon campaign was to first diminish and then eliminate J&M and its dealer network as effective competitors to the Fireplace.

32.     The Fireplace is principally a retailer and provides little wholesale function, with only a small dealer network, and is not entitled to pricing at or below wholesale.

33.     However, the pricing of product to the Fireplace by HHT is principally at or below wholesale level creating a favored price for the Fireplace and a disfavor pricing for J&M and its dealer network.

34.     The Fireplace is able to use its favored pricing basis to compete unfairly with J&M and its dealer network in retail and contractor sales, resulting in a significant loss of sales to J&M and its dealers.  Some competitive pricing by Fireplace was actually below the cost of the J&M dealers reflecting how significantly the Fireplace was favored by HHT's pricing.

35.     HHT's discrimination in pricing had a prohibitive effect on competition.

36.     HHT discriminated in price between J&M and its dealer network by providing disfavored pricing.

37.     The Fireplace competes directly with both J&M and its dealer network for retail sales, including sales outside its five-county Western Pennsylvania territory.  This sales activity includes sales by the Fireplace in West Virginia.

38.     Several of J&M's approved dealers of long-standing had sales locations that the Fireplace complained to HHT were hurting the Fireplace's sales.  The Fireplace pressured HHT to have J&M stop sales to those dealers.  J&M refused.

39.     In October 2010, HHT started a sales lead program, as part of the campaign by HHT and the Fireplace, for inquiries by prospective internet customers that became very successful nationally.  Leads in J&M's territory were directed by HHT to the Fireplace as part of the campaign against J&M.  If the zip codes of the locales in J&M's territories were entered, the

prospective customer was directed to the Fireplace despite the fact a neighboring J&M dealer was close by and the Fireplace may have been up to 100 miles away.

40.     As a further part of this campaign, HHT manipulated its consumer website "lead" system whereby potential customers within J&M territory were directed to the Fireplace locations many miles away without being told of J&M dealers much closer.  The customers were also given discount coupons on the internet if they provided contact information, but the customer could not convert these coupons for use at a local J&M dealer.  This customer information received by HHT was only given to the Fireplace by HHT for J&M's territory, not to J&M or its dealers.

41.     As a further part of this campaign, the Fireplace, after discussions with HHT, also made it known that they would be replacing J&M as a distributor with the intended effect of chilling relations with present and possible future dealers of J&M.

42.     As a further part of this campaign, freight, orders and charge discrepancies were made by HHT in order to place J&M and its dealers at a further competitive disadvantage to the Fireplace.  This included the refusal to allow the long-standing policies related to dropping shipping, substantial increase of freight fees, increased lead times for J&M orders (including for items available to ship immediately), limitations on shipping to one day a week and slow-down in deliveries generally.  HHT even went so far as to begin loading the truck for delivery in a way that required the delivery truck driver to drive hours out of his way by using Wheeling to Ohio and then back to Wheeling for unloading.  The intent of all of this activity was to sabotage the business of J&M and its dealers in order to make it a less effective competitor with the Fireplace.

43.     As a further part of this campaign, changes to the freight and order policies were placed on J&M and its dealers that were not required of the Fireplace, resulting in a further

8

competitive disadvantage.  The Fireplace was also provided with newly released HHT products in advance of the product being provided to J&M and its dealer network.  These new products were featured on the HHT internet site used by potential retail customers but for periods of time could not be purchased by retail customers at J&M dealer locations.

44.     As a further part of this campaign, J&M's co-op sales monies, warranty claim payments and credits were made more difficult to obtain, and promises of qualified payments were not met.  Moreover, the policies relating to these programs were not being applied uniformly throughout the system.

45.     In 2011, J&M proposed four prospective new dealers for HHT products including one in Parkersburg, WV, but J&M received no cooperation from HHT in their review of these candidates and accordingly they were all lost.  This was another aspect of this campaign.

46.     As a further part of this campaign, HHT's delays and lack of service support during this period was meant to hinder J&M's growth and service to its dealer network.

47.     As a further part of this campaign, HHT ignored the e-mail communications and telephone calls necessary to support the ordinary course of J&M's business.  HHT's office staff was instructed to hinder and undercut J&M's business.

48.     As a further part of this campaign, Burn Credits were not given to J&M dealers when they are arbitrarily given to the Fireplace and others.

49.     As a further part of this campaign, Coop monies were not given to J&M and its dealers on the same basis as HHT extended to the Fireplace and others.

50.     As part of this campaign, HHT began to sell items direct to J&M customers within J&M's territory, including parts, pipe, and other items and solicited J&M dealers to buy direct from HHT.

51.     In particular, HHT began selling parts in J&M's territory directly to their customer base with HHT using a discount on parts pricing not available to J&M. J&M could not compete with this pricing resulting in lost sales to J&M.

52.     As part of this campaign, HHT has provided J&M little sales service and support. Its regional representative, John Lester, failed to support J&M and its dealers in its sales efforts and failed to provide the required customer service. John Lester has distorted and provided false information to J&M about the HHT programs and policies. On information and belief, John Lester has been directed by supervisors to engage in such activity.

53.     In 2011, J&M began to complain to HHT about the apparent campaign to sabotage J&M.

54.     In retaliation to those complaints, and in further part of this campaign, on March 19, 2012, HHT sent letter notice that purported to terminate its relationship with J&M effective May 31, 2012 and take over J&M's relationship with its dealer network. The letter included unreasonable and bad faith terms concerning orders and buy-back of inventory as well.

55.     The effect of the purported termination would be to put J&M out of business without fair compensation. HHT has offered no compensation for the J&M business at all despite the fact that they are misappropriating J&M's sales to J&M dealers (in excess of $1.5 million per year), its dealer sales network and goodwill, all of which had been created by J&M. J&M employees would lose their jobs. J&M would lose sales already accepted by HHT, all anticipated sales for the close-at-hand full season, and all profits on such sales would be taken by HHT. J&M would lose the profits and goodwill of its business in their entirety. This is being done despite the fact that this network has been consistently acknowledged by HHT to be J&M's and not HHT's.

56.     As part of this campaign, HHT has not made arrangements to take over sales to the three dealers close by to the Fireplace who were the subject of complaints by the Fireplace. These three dealers will lose their right to sell HHT products and those sales would go to the Fireplace.

## COUNT I
## BREACH OF CONTRACT
## (J&M v. HHT)

57.     J&M incorporates by reference paragraphs 1 through 56 above, as if fully set forth herein.

58.     HHT breached its contractual agreement with J&M, developed over a twenty-five year course of dealing, by all of the foregoing actions.

59.     HHT has additionally breached and continues to breach the implied duty of good faith and fair dealing, owed to J&M.

60.     The timing of the attempted termination, and the amount of notice associated with a May 31 date, reflects commercial unreasonableness and a business vindictiveness, and is also a breach of the agreement and the associated implied duty of good faith and fair dealing, as evidenced by the following:

a.      the attempted termination occurred right after the annual national conference of the industry (HPBA Expo) and, therefore, J&M was denied the opportunity to pursue other manufacturer relationships at the only national event for that purpose.  At the conference, J&M was misled about their status with HHT as J&M was invited to the large HHT event at the show for those that carry the HHT products.  At that meeting extensive and confidential sales information and HHT business plans were revealed to J&M as an insider;

      b.     the attempted termination occurs when the J&M dealers are placing orders for the fall sales season.  In fact, HHT has now canceled previously acknowledged orders in excess of $319,954.56 (prior to LTD discounts) because they would ship after the May 31 date;

      c.     HHT has already scheduled meetings directly with J&M dealers in advance of the May 31 date without J&M's permission and is offering them some pricing that had been available to J&M;

      d.     the terms of the buy-backs and the lack of any fair credit arrangements are commercially unreasonable; and

      e.     the amount of notice is commercially unreasonable and inconsistent with the notice that HHT feels is reasonable in ending a relationship with it.

61.     As a result of the material breaches of contract described above, J&M is entitled to damages for HHT's numerous breaches.

WHEREFORE, J&M demands judgment on this Count against the HHT, for damages in excess of the jurisdictional minimum, reasonable attorneys' fees, costs of suit and interest thereon, and for such other and further relief as the Court may deem appropriate.

**COUNT II**
**TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS**
**(J&M v. HHT and the Fireplace)**

62.     J&M incorporates by reference the allegations contained in Paragraphs 1 through 61 as if fully rewritten herein.

63.     J&M has a business relationship with its dealers to whom it offers products and/or services and for which it receives compensation.

64.     HHT and the Fireplace were not a party to the relationships or agreements between J&M and its dealers.

65. HHT and the Fireplace unlawfully and without privilege tortiously and unlawfully interfered with the relationships and agreements between J&M and its dealers and induced J&M's retail dealers, for whom J&M developed relationships and previously provided products and/or services, to break off their relationships with J&M.

66. HHT and the Fireplace acted willfully, intentionally, tortiously, without privilege, and without legal justification to force J&M's retail dealers to terminate business relationships with J&M.

67. HHT and the Fireplace's actions were done willfully, maliciously, and with indifference to the rights of the J&M, making HHT and the Fireplace liable for punitive damages in an amount to be determined by the trier of fact.

68. As a result of the inducement of J&M's dealers by HHT and the Fireplace, J&M has lost customers, business, profits, assets, and sales, costing it revenue it would have otherwise made.

69. As a result of HHT and the Fireplace's tortious interference into the business relationship between J&M and its retail dealers, J&M has been damaged and continues to suffer damages for which J&M is entitled to recover.

WHEREFORE, J&M demands judgment on this Count against HHT and the Fireplace, for damages in excess of the jurisdictional minimum, punitive damages, reasonable attorneys' fees, costs of suit and interest thereon, and for such other and further relief as the Court may deem appropriate.

## COUNT III
## UNFAIR COMPETITION
### (J&M v. HHT and the Fireplace)

70.     J&M incorporates by reference the allegations contained in Paragraphs 1 through 69 as if fully rewritten herein.

71.     HHT and the Fireplace's conduct constitute unfair competition with J&M.

72.     As a direct result of HHT and the Fireplace conduct, J&M has been damaged in the form of lost revenue and profit in an amount that may be determined at the trial hereof.

WHEREFORE, J&M demands judgment on this Count against HHT and the Fireplace, for damages in excess of the jurisdictional minimum, punitive damages, reasonable attorneys' fees, costs of suit and interest thereon, and for such other and further relief as the Court may deem appropriate.

## COUNT IV
## CIVIL CONSPIRACY
### (J&M v. HHT and the Fireplace)

73.     J&M incorporates by reference the allegations contained in Paragraphs 1 through 72 as if fully rewritten herein.

74.     HHT and the Fireplace constituted a combination of parties who acted together in concert to profit by means of their unlawful and tortious conduct toward J&M.  These co-conspirators shared the same conspiratorial objective.

75.     HHT and the Fireplace executed their conspiracy by taking overt acts in its furtherance, including its campaign of sabotage and actively soliciting J&M and its dealers' customers and moving into J&M's territory and engaging in unfair competition.

76.     As a direct and proximate result of the inducement of J&M dealers by HHT and the Fireplace, J&M has lost sales and dealers, costing J&M revenue it would have otherwise made.

77.     Therefore, each of the co-conspirators is liable to J&M for all conduct in furtherance of the conspiracy and J&M is entitled to recovery.

WHEREFORE, J&M demands judgment on this Count against HHT and the Fireplace for damages in excess of the jurisdictional minimum, punitive damages, reasonable attorneys' fees, costs of suit and interest thereon, and for such other and further relief as the Court may deem appropriate.

## COUNT V
## VIOLATIONS OF THE SHERMAN ACT, SECTION 1
### (J&M v. HHT and the Fireplace)

78.     J&M incorporates by reference the allegations contained in Paragraphs 1 through 77 as if fully rewritten herein.

79.     Section 1 of the Sherman Act prescribes any contract, combination or conspiracy that unreasonably restrains trade or commerce, 15 U.S.C. § 1.

80.     HHT and the Fireplace have engaged in and agreed upon concerted action directed at eliminating both J&M and its dealer network as effective competitors of the Fireplace.  They have entered into an agreement or a conscious commitment to take joint action for antitrust purposes against J&M and its dealer network in order to first sabotage sales J&M and its dealers and then to terminate J&M in order to eliminate competition for the Fireplace and allow the Fireplace to have greater sales generally and in J&M's exclusive territory.  This agreement has, and will have, an anti-competitive effect and consequences on interstate competition and markets, particularly within one hundred miles of Pittsburgh, Pennsylvania.

15

81.     HHT and the Fireplace's conduct is in violation of Section 1 of the Sherman Act.

82.     J&M has suffered an antitrust injury by this contract, combination or conspiracy that unreasonably restrains trade and commerce.

83.     J&M has suffered damages proximately caused by said violations of Section 1 of the Sherman Act.

WHEREFORE, J&M demands judgment on this Count against HHT and the Fireplace, for damages in excess of the jurisdictional minimum, trebled damages, attorneys' fees, costs of suit and interest thereon, and for such other and further relief as the Court may deem appropriate.

**COUNT VI**
**VIOLATIONS OF THE ROBINSON-PATMAN ACT, Section 2(a)**
**(J&M v. HHT)**

84.     J&M incorporates by reference the allegations contained in Paragraphs 1 through 83 as if fully rewritten herein.

85.     Multiple sales by HHT over time to J&M for its dealers and the Fireplace were made in interstate commerce reasonably close in points of time.

86.     HHT sales made to distributors are for sales to dealers and are the same products sold to retailers.  The products sold to J&M are of the same grade and quality as those sold to the Fireplace.

87.     HHT has differed and discriminated in price in sales to J&M and its dealer network and the Fireplace.  HHT has favored the Fireplace with effectively lower pricing resulting in lost sales by J&M and its dealer network and competitive injury.

WHEREFORE, J&M demands judgment on this Count against HHT for damages in excess of the jurisdictional minimum, treble damages, attorneys' fees, costs of suit and interest thereon, and for such other and further relief as the Court may deem appropriate.

16

**COUNT VII**
**VIOLATIONS OF ROBINSON PATMAN ACT, Sections 2(d) and 2(e)**
**(J&M v. HHT)**

88.     J&M incorporates by reference the allegations contained in Paragraphs 1 through 87 as if fully rewritten herein.

89.     Section 2(d) and 2(e) of the Robinson-Patman Act makes it an offense to grant advertising promotional allowances or service to a favored customer for services furnished by a customer in connection with the processing, handling, sale or offering for sale of the seller's product unless the payment is "made available on proportionally equal terms" to all competing customers.

90.     The Fireplace is a favored customer under Section 2(d) and 2(e) and has received, for its resale activities, the benefit of generated retail leads, retail customer discount coupons, higher credits, higher cooperative advertising allowances, more frequent deliveries, better freight terms and short delivery times than are available to J&M and its dealers on proportionally equal terms.

91.     Both J&M and its dealer network are customers for purposes of Section 2(d) and 2(e) and are in competition with the Fireplace.

92.     HHT has discriminated against J&M and its dealer network in connection with promotional services and allowances that are made available on disproportionate and unequal terms with resultant injury to competition.

93.     The services and allowances are connected to sales to the Fireplace as a favored purchaser in competition with both J&M and its dealer networks.

94.     The services and allowances were not realistically available to J&M and its network of dealers since HHT favored large, urban retail purchasers over small town dealers.

95.     HHT is liable to J&M for violating Sections 2(d) and 2(e) of the Robinson Patman Act

WHEREFORE, J&M demands judgment on this Count against HHT for damages in excess of the jurisdictional minimum, treble damages, reasonable attorneys' fees, costs of suit and interest thereon, and for such other and further relief as the Court may deem appropriate.

### COUNT VIII
### VIOLATIONS OF THE ROBINSON-PATMAN ACT, Section 2(f)
### (J&M v. the Fireplace)

96.     J&M incorporates by reference the allegations contained in Paragraphs 1 through 95 as if fully rewritten here.

97.     Section 2(f) of the Robinson-Patman Act prohibits knowingly inducing or receiving a discrimination in price which is prohibited by Section 2(a) of the Act.

98.     The Fireplace had knowledge that it was receiving a favored and discriminating price from HHT (principally Heat-N-Glo).

99.     The Fireplace also had knowledge that it was receiving discriminatory promotional allowances not available to its competitor J&M and its dealer networks.  These promotional allowances were an effective reduction in price of goods to the Fireplace resulting in competitive injury.

100.    The Fireplace has violated Section 2(f) and is liable to J&M for its violation.

101.    J&M has suffered an antitrust injury by the Fireplace's violation of 2(f) and suffered damages proximately caused therefrom.

WHEREFORE, J&M demands judgment on this Count against the Fireplace for damages in excess of the jurisdictional minimum, treble damages, attorneys' fees, costs of suit and interest thereon, and for such other and further relief as the Court may deem appropriate.

18

## COUNT IX
## INJUNCTIVE RELIEF
### (J&M v. HHT and the Fireplace)

102.    J&M incorporates by reference paragraphs 1 through 101 above, as if fully set forth herein.

103.    HHT and the Fireplace's action threatens J&M's very existence as an ongoing operation, is causing irreparable harm to J&M's business goodwill and reputation that cannot be compensated by monetary damages alone.

104.    J&M therefore seeks both temporary and permanent injunctive relief barring HHT and the Fireplace from continuing in their illegal course of conduct both during the pendency of this litigation and beyond.

105.    Should J&M prevail on the merits of this action, it is entitled to a permanent injunction under West Virginia law because it would suffer further irreparable harm without an injunction; the harm to J&M would vastly exceed the harm to the Defendants from the imposition of an injunction; and the public interest would not be adversely affected by an injunction.

106.    Further, HHT should be permanently enjoined from tortiously interfering with J&M's business and from improperly attempting to terminate their relationship without fair compensation and from continuing to attempt to wrongfully take over J&M's customers and territory without compensation.

WHEREFORE, J&M seeks an injunction against HHT and the Fireplace as described above preventing them from further illegal conduct toward J&M, and for such other and further relief as the Court may deem appropriate.

## PRAYER FOR RELIEF

**WHEREFORE**, J&M demands judgment against HHT and the Fireplace as follows:

A.     For compensatory damages to be paid by them in an amount to be determined by the jury;

B.     For such punitive damages as may be awarded by jury;

C.     For temporary and permanent injunctive relief as requested herein;

D.     For J&M to be awarded any incidental, special, consequential, treble and other damages the court deems just and appropriate;

E.     For pre-judgment and post-judgment interest, court costs and reasonable and trebled attorney fees under the law; and

F.     Any such further relief that this Court deems just and appropriate.

**A JURY TRIAL IS DEMANDED ON ALL COUNTS SO TRIABLE**

Respectfully submitted,

**J & M DISTRIBUTING, INC.**, a West Virginia corporation,

by counsel.

____/s/Donald A. Nickerson, Jr._____
Donald A. Nickerson, Jr. (WV State Bar #6281)
JACKSON KELLY PLLC
P. O. Box 871
Wheeling, WV  26003
Email:  danickerson@jacksonkelly.com
Phone: (304) 233-4000
Fax:  (304) 233-4077

_____/s/ Parween S. Mascari_____
Parween S. Mascari (WV State Bar #9437)
JACKSON KELLY PLLC
150 Clay Street; Suite 500
Post Office Box 619
Morgantown, WV  26507
Email:  pmascari@jacksonkelly.com
Phone: (304) 284-4100
Fax:  (304) 284-4142